**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

CHAQUITA RUMBLE,

                Plaintiff,

v.                                    ACTION NO. 2:13cv500

CAROLYN W. COLVIN,

                Defendant.

**UNITED STATES MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

    Ms. Chaquita Rumble brought this action on behalf of her son, Q.J.D. (hereinafter referred to as "Plaintiff"), under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for child's Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

    This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference, dated November 25, 2013.  ECF No. 8.  This Court recommends that the decision of the Commissioner be AFFIRMED.

**I.  PROCEDURAL BACKGROUND**

    Plaintiff, through his mother, protectively filed an application for SSI on December 13, 2010, alleging he had been disabled since his date of birth, September 27, 2010, due to

respiratory distress and hydronephrosis. R. 110-17, 145.[1]  Her application was denied, both initially on February 10, 2011, and upon reconsideration on April 28, 2011. R. 85-87, 103-06. At Plaintiff's request, a hearing before an Administrative Law Judge ("ALJ") took place on February 22, 2012. R. 37-68.  Plaintiff's mother and grandmother testified.  R. 37-68.  On April 25, 2012, the ALJ issued a decision denying Plaintiff's claim for SSI. R. 8-23. The Appeals Counsel denied a request to review that decision on July 13, 2013, making the ALJ's decision the Commissioner's final decision.  R. 1-4.

Having exhausted all administrative remedies, Plaintiff filed a motion for leave to proceed in forma pauperis, with attached complaint, with this Court on September 12, 2013, which was granted and the complaint filed on September 19, 2013.  ECF Nos. 1 & 3.  Defendant answered on November 22, 2013. ECF No. 7.  Pursuant to an order from the Court, Plaintiff filed a response to the order, ("Plaintiff's Response"), which this Court construes as a motion for summary judgment.  ECF No. 11.  Defendant filed a cross motion for summary judgment. ECF No. 12. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. <u>FACTUAL BACKGROUND</u>

Plaintiff, who was born in 2010, was almost seventeen months old at the time of his hearing before the ALJ. R. 42. He and his twin brother were born prematurely, at approximately thirty-two weeks.  R. 181.  He was almost three years old at the time this appeal was filed in federal court.

### A.    Medical Records

Plaintiff was born on September 27, 2010, at Sentara Norfolk General Hospital, as one of twins.  R. 181, 185, 195.  Plaintiff initially required oxygen for approximately one minute, and

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

was immediately hospitalized for prematurity, possible respiratory distress, and antenatal diagnosis of hydronephrosis with palpable abdominal masses.  R. 181, 185, 195.  He was transferred to the care of Children's Hospital of the King's Daughters (CHKD).  R. 183, 186, 196.  The examining physician, Jamil H. Kahn, M.D., found palpable abdominal masses on Plaintiff's left and right sides.  R. 182, 186, 196.  A renal ultrasound confirmed severe bilateral hydronephrosis.  R. 183, 198.  A voiding cystourethrogram was also performed, showing no evidence of vesicoureteral reflux.  R. 200.  A chest X-ray revealed that Plaintiff had no endotracheal tube present, hypoinflated but clear lungs, and a gassy abdomen, with several loops of bowel which were tubular in configuration.  R. 202.

An examination and MAG3 test done on September 28, 2010, revealed that Plaintiff had slightly delayed uptake by both kidneys, and a differential function of approximately forty-nine percent on the right and fifty-one percent on the left.  R. 205.  The test also found no evident excretion post-Lasix, which suggested "significant obstruction secondary to ureteropelvic junction obstruction."  R. 205.  On September 29, 2010, Jyoti Upadhyay, M.D., diagnosed Plaintiff with grade four hypronephrosis without signs for posterior urethral valves or vesicoureteral reflux, and recommended bilateral retrogrades and bilateral pyeloplasty.  R. 206-07.  In an abdominal X-ray, Plaintiff showed unremarkable bowel gas pattern with no evidence of obstruction or perforation.  R. 208.  A renal scan on September 28, 2010 confirmed renal function at fifty-one percent on the right and forty-nine percent on the left.  R. 210.

On September 30, 2010, Plaintiff underwent a series of chest X-rays, the first of which showed an increase in the amount of mildly air distended bowel loops, which was potentially an early sign of necrotizing enterocolitis. R. 212.  He also showed a "[r]ight arm PICC retracted, tip now overlying the right ventricle," with a recommendation to retract an additional three

centimeters.  R. 212.  The right arm PICC retracted continued through the day, but the bowel loops were not mentioned by further X-ray reports.  R. 214, 216.  A report by Dr. Kahn on October 5, 2010, indicated little change in Plaintiff's condition.  R. 218-21.  A renal examination indicated that there were small amounts of floating debris in the left renal pelvis.  R. 222.

On October 6, 2010, Plaintiff underwent a cystoscopy, bilateral retrograde pyelograms, and bilateral double-J stent placement, in lieu of the pyeloplasty, due to Plaintiff's small size.  R. 224.  The plan was to remove the stents in ten weeks.  R. 225.  A renal ultrasound took place on October 11, 2010, which indicated improvement in plaintiff's kidneys.  R. 228.  An abdominal X-ray on October 13, 2010, indicated that the proximal loops of the ureteral stents were projected over the kidneys, and that distal loops were projected over the bladder.  R. 235.  The X-ray also revealed a gassy abdomen.  R. 235.  A subsequent abdominal X-ray the next day found increasing bowel distension, including mild generalized dilation, but no evidence of pneumatosis.  R. 239.

A renal ultrasound on October 25, 2010, showed increased bilateral hydronephrosis, with a small amount of debris in the collecting systems bilaterally.  R. 241.  On October 27, 2010, Plaintiff received a bilateral pyeloplasty with bilateral open nephrostomy tubes.  R. 243-45.  A surgical pathology final report indicated that the Plaintiff was diagnosed with uteropelvic junction, pyeloplasty, with fibrosis, on both sides.  R. 246.  On November 2, 2010, a renal ultrasound showed moderate to severe bilateral pelvicaliectasis, mildly improved on the right and minimally improved on the left.  R. 252.  Over November 3, 2010, Plaintiff received three abdominal X-rays.  R. 254-59.  The first showed multiple dilated loops of bowel throughout Plaintiff's abdomen and increasing bowel dilation.  R. 254.  The second showed increasing bowel dilation compatible with distal obstruction.  R. 256.  By the third, Plaintiff showed

4

improving bowel dilation.  R. 258.  On November 11, 2010, Plaintiff showed normal bowel gas patterns.  R. 269-74.

On November 5, 2010, Plaintiff underwent a surgical consultation after the discovery of a stricture on Plaintiff's transverse colon.  R. 260-62, 265.  Plaintiff underwent a barium enema on November 22, 2010, which indicated that his colonic stricture appeared worse, and there was now a near-total obstruction.  R. 275.  An abdominal X-ray on November 29, 2010, showed Plaintiff had persistent mild to moderate gaseous distention of the small bowel and mild distention of the distal colon.  R. 279.  Plaintiff underwent an exploratory laparotomy, segmental colon resection with primary anastomosis, and appendectomy on November 29, 2010.  R. 188-190, 281-83.  The surgical pathology report following the surgery showed Plaintiff's right colon segmental resection was distorted, with dense serosal adhesions and ganglion cells identified; the transverse of the right colon segmental resection had an area of perforation and abscess formation and ganglion cells identified; and vermiform appendix with no histopathologic diagnosis and ganglion cells identified.  R. 277.  A repeat examination on December 7, 2010, showed mild to moderate improvement of Plaintiff's marked right pelvicaliectasis, and moderate improvement in Plaintiff's moderate to marked pelvicaliectasis.  R. 294.

Chest X-rays on November 29, 2010, and December 1, 2010, show an appropriately positioned endotracheal tube, but atelectasis in the left upper, right upper, and left lower lobes.  R. 284-87.  An X-ray on December 2, 2010 indicated an interval collapse of the left lung.  R. 288.  A second X-ray that day showed improvement in the left lung collapse, R. 290, but an X-ray on December 4, 2010 indicated Plaintiff's lungs were severely hypoinflated.  R. 292.

On December 15, 2010, Plaintiff underwent a final analysis by Dr. Kahn.  R. 297-301. Plaintiff at that time had an interim diagnosis of prematurity; "bilateral hydronephrosis, status

post ureteral stents on 10/06, status post bilateral pyeloplasties with bilateral nephrostomy tubes on 10/27, status post removal of stents and nephrostomy tubes on 11/04;" risk for urinary tract infections; "colonic stricture, status post removal of ascending colon with primary anastomosis on 11/29, appendectomy on 11/29;" wound dehiscence; slow motility; and at risk for osteopenia of prematurity. R. 301. Plaintiff was discharged from CHKD on December 19, 2010. R. 303-08.

On January 5, 2011, Plaintiff's mother brought Plaintiff to the emergency room with a complaint that Plaintiff was constipated. R. 309. The examination was benign, but Plaintiff was scheduled to be admitted the following day to assess his stent placement. R. 310-11. On January 6, 2011, a renal ultrasound revealed a newly-discovered hepatic parenchymal cyst, and improvement in Plaintiff's bilateral hydronephrosis. R. 312. A renal scan from the same day showed significant improvement since September 28, 2010, with improved bilateral excretion, now normal on the left and much improved on the right. R. 313-15.

On January 20, 2011, Plaintiff had a follow-up appointment in CHKD's Urology Clinic. R. 348-49. The report following indicated that a January 6, 2011 renal scan showed no obstructive process, right kidney function of fifty-seven percent and left kidney function at forty-three percent. R. 348. As a result, Plaintiff was assessed with congenital bilateral hydronephrosis, status post pyeloplasties with nephrostomy tube and stent removal; and bilateral residual grade three hydronephrosis with no obstructive process. R. 349. On January 21, 2011, Plaintiff had a follow-up appointment with the surgical office. R. 351-52. The subsequent report indicated that Plaintiff was doing well since he returned home, where he was eating, gaining weight, and having a bowel movement almost every day. R. 351. The surgeon indicated that he was very happy with Plaintiff's surgical recovery. R. 351.

On February 15, 2011, Plaintiff and his family underwent an individual family service plan (IFSP) by the Infant and Toddler Connection of Virginia. R. 326-41. During the evaluation, Plaintiff was described as a social baby who showed greater interest in people than toys, attended to whoever was speaking, followed his mother around the house, was starting to recognize a bottle, tolerated tummy time, was beginning to be able to shake a rattle, and was showing different cries for hunger, tiredness and pain. R. 329-31. He was described as having "emerging" skills as compared to other five-month-old children. R. 329-31. Plaintiff was given short-term goals, R. 333-34, and plans for transition out of early intervention, R. 336-37.

On March 30, 2011, Plaintiff had an appointment with CHKD's Nephrology Department. R. 353-55. In the report that followed, Plaintiff was described as having a good appetite and good bowel movements recently, and having no concerns other than possible hypertension. R. 353. Plaintiff was also feeding on NeoSure formula and was not eating solid foods, nor was he showing an interest in table foods. R. 353. The doctor indicated that Plaintiff did not require management for hypertension. R. 354. Plaintiff's right-sided hydronephrosis showed worsening, while his left-sided hydronephrosis was largely stable. R. 354.

On April 21, 2011, Dr. Upadhyay indicated concern with Plaintiff's constipation, stating that his stooling only every three days was likely deterring any improvement in his hydronephrosis. R. 361-62. On that same day, Plaintiff had a renal ultrasound, which showed slight worsening in Plaintiff's left kidney, though his right kidney remained stable. R. 363.

On April 29, 2011, Plaintiff was seen by Michael Konikoff, M.D., from CHKD's Pediatric Gastroenterology Office. R. 365-67. Dr. Konikoff noted that Plaintiff's stools had become less frequent and harder, and that Plaintiff "is noted to have some straining behavior." R. 365. In response to this, Dr. Konikoff increased Plaintiff's laculose intake, suggested a

possible barium enema if the symptoms persisted, and requested that Plaintiff return in six to eight weeks.  R. 366.  On the same day, Plaintiff was seen by CHKD's Surgical Office.  R. 368-69.  The notes from that visit indicated that Plaintiff was recovering well from his surgery.  R. 368-69.

On May 23, 2011, Plaintiff presented at the Pediatric Gastroenterology Office of CHKD, where his mother informed them that Plaintiff's constipation was worse; he produced round hard balls of stool one or two times per week.  R. 370.  Plaintiff was taken off laculose and put on MiraLax.  R. 371.  On May 27, 2011, Plaintiff underwent a barium enema, which revealed no obstruction and no stricture in Plaintiff's bowels, but that he had multiple intraluminal filling defects that were consistent with retained focal fecal matter.  R. 372.

On June 21, 2011, Plaintiff underwent a renal scan, which showed that his left kidney remained normal, and his right kidney had delayed uptake and excretion in a pattern similar to the scan performed on January 6, 2011.  R. 374-75.  On June 24, 2011, Plaintiff returned to the Nephrology office for a follow-up visit.  R. 377-78.  The report from that visit noted that though Plaintiff had been having constipation issues, those issues had resolved since he started taking polyethylene glycol.  R. 377.  The report also noted that Plaintiff was developing well, and currently could crawl.  R. 377.  Plaintiff's hydronephrosis, worse on the right than the left, remained mostly stable from his previous ultrasound, and a MAG3 scan showed Plaintiff's uptake was forty-five percent on the left and fifty-four percent on the right.  R. 377-79.  On June 27, 2011, Plaintiff was seen again by the Pediatric Gastroenterology office, where they noted that Plaintiff was doing much better with his constipation and having a loose bowel movement up to three times a day.  R. 381.  Plaintiff also followed up with Children's Urology, where they noted that Plaintiff was doing well, and having daily soft bowel movements. R. 385.  Plaintiff's mother

8

was concerned about his circumcision, noting redness and rash.  R. 385.  On July 26, 2011, Plaintiff underwent a second circumcision, or a "penile adhesion takedown."  R. 383-84.

On September 12, 2011, Plaintiff was seen again by the Pediatric Gastroenterology Office for a follow-up visit.  R. 388-89.  They noted that his constipation was much improved, and that he now tolerated stage 3 and some soft table foods well.  R. 388.  Otherwise, Plaintiff was well-nourished, well-developed and in no acute distress.  R. 388.  On December 8, 2011, Plaintiff had bilateral myringotomy and ventilation tube placement, in response to chronic serious otitis media that was not responsive to medication.  R. 393.  Plaintiff's postoperative diagnosis was chronic serious otitis media, recurrent otitis media, and hearing loss of the middle ear.  R. 393.

On January 12, 2012, Plaintiff was seen by Dr. Upadhyay, who noted Plaintiff was still struggling with constipation, and only stooling every other day.  R. 395.  Dr. Upadhyay also indicated that Plaintiff had a four-centimeter ball of stool posterior to his bladder, which was "deterring the ability for the bladder to complete empty."  R. 395.  An abdominal X-ray indicated a nonspecific nonobstructive bowel gas pattern, and a moderate amount of retained stool.  R. 401.

A renal scan on February 1, 2012, showed improved peak time for perfusion in the right kidney, and a normal left kidney.  R. 403.  On February 2, 2012, Plaintiff returned to the Children's Urology Department for a follow-up.  The report from that visit indicated Plainitff had fifty-eight percent functioning in his right kidney and forty-two percent in his left.  R. 405. It also indicated that there was no longer residual obstruction.  R. 405, 408.  Plaintiff still occasionally had hard stools, and his dosage of MiraLax was increased in response.  R. 406.  A

follow-up in Pediatric Surgery indicated that Plaintiff did not require any further surgical treatment.  R. 410.

On February 29, 2012, the Norfolk Community Services Board performed a parent report and observation.  Records from this visit indicate that Plaintiff sat alongside unfamiliar people with both parents in the room, and attended to all tasks he was given.  R. 456.  He smiled and looked at everyone, though he was drooling and made no motions to stop it.  R. 456.  He walked around after his brother, but did not consistently respond to sounds and was very quiet.  R. 456.  He attended to all activities once engaged, but did not consistently respond to verbal cues or his name.  R. 458.  He enjoyed social games like pat-a-cake and liked to make adults laugh, but the report speculated that he may have a hearing issue.  R. 458.

On March 21, 2012, Plaintiff had a second discussion with Infant and Toddler Connection of Virginia, regarding Plaintiff's IFSP.  R. 411-26, 432-48.  Plaintiff's mother expressed an interest in pursuing special education preschool because Plaintiff was not yet speaking, was not imitating sounds, and did not respond to his name or other sounds consistently. R. 412, 433.  Infant and Toddler Connection of Virginia performed a team assessment narrative in a variety of categories.  R. 413-17, 434-38.  For Positive Social-Emotional Development and Relationships, the report indicated that Plaintiff enjoyed playing with his sister and cousins, and would go sit with them and join in play.  R. 413, 436.  He experienced slight separation anxiety, that was starting to resolve, and felt independent enough to wander into other rooms by himself. R. 413, 436.  He showed some understanding of the word "no," though it was not consistent, and seemed to also respond inconsistently to his own name.  R. 413, 436.  He enjoyed special games such as "pat-a-cake" and would imitate gestures.  R. 413, 436.  He also imitated doing housework by pushing a mop or broom along the floor, and liked to please adults; he would

repeat actions that made adults laugh. R. 413, 436. He expressed emotion through laughing or crying, and only threw occasional mild, age-appropriate tantrums. R. 413, 436. When compared to other children of the same age, Plaintiff only had some of the skills that are expected; Plaintiff did not demonstrate, for example, the abilities to call family members by name, imitate adult activities like talking on the phone, or use words like "no" or "stop" to assert himself. R. 414, 435.

For Acquisition of New Knowledge and Skills, the report indicated that Plaintiff enjoyed exploring toys in different ways, including looking at them, banging them, and mouthing them. R. 415, 434. He demonstrated the ability to actively look for his toys, and could manipulate one piece of a three-piece foam board puzzle to solve the puzzle. R. 415, 434. He also liked to scribble on paper with crayons and could open up small boxes to find blocks or toys inside. R. 415, 434. He sometimes responded to his name, and generally responded to the word "no" if it was said loudly and firmly. R. 415, 434. He followed simple commands if they were accompanied by a hand gesture, but the family reported it seemed like he only sometimes heard. R. 415, 434. Plaintiff would move to music if it was held to his ear, and expressed himself through crying and laughing. R. 415, 434. He made babbling noises "like a cat," but showed no sounds toward making words. R. 415, 434. He waved "bye-bye" when shown how, and tried to imitate hand gestures from nursery rhymes. R. 415, 434. When compared to children of his own age, he had some of the expected problem-solving skills, but was not demonstrating others such as making a wide variety of sounds, using "mama" and "dada" with meaning, pretending to sing along with music, pointing to items for someone to get or name for him, and following verbal directions to look for an item. R. 415-16, 437. The report recommended an audiological assessment. R. 416, 437.

For Ability to Take Actions to Get Needs Met, the report indicated that Plaintiff could walk and push toys to explore his environment, and was very curious about how things worked. R. 417, 438.  If something was in Plaintiff's way, he would move it or move around it to get what he wanted.  R. 417, 438.  He was not yet pushing his arms through clothing or lifting his legs to help with dressing, but could pull socks off his feet or a hat off his head.  R. 417, 438.  He was not yet pointing or using his voice to express wants or needs, and did not consistently respond to commands.  R. 417, 438.  Plaintiff underwent a review of his IFSP on April 27, 2012, at which time the Infant and Toddler Connection of Virginia decided to increase his speech therapy to once a week.  R. 446.

Also included in the Administrative Record are disability determination explanations from state agency physicians, performed both initially on February 10, 2011, and upon reconsideration on April 25, 2011.  R. 69-84.  In both instances, The state agency physicians found that Plaintiff had a medically determinable impairment of nephrotic syndrome, but that the impairment did not meet, medically equal, or functionally equal an impairment in the listings. R.71-72, 79-80.

**B.      Hearing Testimony – February 22, 2012**

Plaintiff's mother testified on his behalf at Plaintiff's hearing before the ALJ.  She testified that she was the primary caregiver for Plaintiff and his siblings, but that she worked part-time and when she was working, her mother (Plaintiff's grandmother) watched the children. R. 44-45.  She testified that Plaintiff was kept in the hospital for approximately three months after he was born, though Plaintiff's twin brother went home with them after a month in the hospital.  R. 46.  Both twins were born at thirty-two weeks, both had low birth weight, and Plaintiff had hydronephrosis at birth.  R. 47.   Plaintiff took Furadantin for his kidney problem

and MiraLax for his colon, as well as ear drops because of the tubes in his ears.  R. 49.  He went to therapy twice a week, where they were "trying to teach him how to catch, hold things, [and] help him try to . . . pronounce words . . . ."  R. 50-51.  Plaintiff's mother said that he went to therapy because he was "delayed."  R. 50.  Plaintiff began walking at fifteen or sixteen months, and based on body size and height, Plaintiff had "a whole lot of catching up."  R. 53.  Plaintiff went to CHKD "all the time," both for scheduled visits and "when there's problems."  R. 55.  Plaintiff was on a diet restricted to cold milk and water, along with his medication; he could not have juice, fruits, white bread, or pasta.  R. 57.  Plaintiff's mother described him as a happy child, though he could not say any words, and did not seem interested in toys like rattles or mobiles.  R. 58-59.  He occasionally got a distended belly.  R. 60.  Plaintiff's mother confirmed his grandmother's earlier statement that Plaintiff is slower than his twin, but not as fussy.  R. 61.

Plaintiff's grandmother also testified.  She indicated that while Plaintiff is a little behind his twin brother, but his twin brother throws tantrums and is fussier than Plaintiff.  R. 62.  She stated that Plaintiff gets "big stomach swells" when he does not wet his diaper or stool.  R. 62.  Plaintiff's grandmother also discussed the stool ball that had accumulated in Plaintiff's bladder, that prevented him from proper urination.  R. 64-65.  She stated that Plaintiff could not say "dada" or "mama," despite the fact that his twin brother could, and that doctors had informed her that he may have scarring in his ears once they remove the tubes.  R. 66.  In response to a question from the ALJ, she indicated that Plaintiff's mother was not planning to potty train Plaintiff for some time.  R. 66.

C.    **ALJ's Decision – September 19, 2011**

The ALJ found at Step One that Plaintiff has not engaged in substantial gainful activity since November 10, 2010, the date on which his claim was filed.  R. 14.  At Step Two, the ALJ

found that Plaintiff had severe impairments of nephritic syndrome, developmental delay (premature birth), and abdominal mass, status post surgery.  R. 14.  At Step Three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of one of the impairments in the listings, and Plaintiff also did not have an impairment or combination of impairments that functionally equaled the severity of the listings.  R. 14-22.  Based on this, the ALJ found that Plaintiff was not disabled under the requirements of the Social Security Act.

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence,

are conclusive and must be affirmed, unless the decision was reached by means of an improper

standard or misapplication of the law.  *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d

514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).

Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's

determination is not supported by substantial evidence on the record, or (B) the ALJ made an

error of law.  *Coffman,* 829 F.2d at 517.

## IV. ANALYSIS

Under the Social Security Act, a child's eligibility for Social Security benefits is

determined by a three step evaluation of whether the child (1) is engaged in substantial gainful

activity, (2) has a medically determinable impairment or impairments that is severe, and (3) that

the impairment or impairments meets, medically equals, or functionally equals an impairment in

the Listing of Impairments.  20 C.F.R. § 416.924.  A child meets an impairment from the listings

if he or she has "a medically determinable impairment(s) that satisfies all of the criteria of the

listing."  20 C.F.R. § 416.925(d).  A child's impairment medically equals the listings if "it is at

least equal in severity and duration to the criteria of any listed impairment."   20 C.F.R.

§ 416.926(a).   A child's impairment functionally equals the listings if it results "in 'marked'

limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R.

§ 416.926a(a).

When determining functional equivalence, the Commissioner looks at six specific

domains in order to determine limitations: (i) acquiring and using information; (ii) attending and

completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating

objects; (v) caring for yourself; and (vi) health and physical well-being.   20 C.F.R.

§ 416.926a(b)(1).  Importantly, the Commissioner recognizes that "not all children within an age

category are expected to be able to do all of the activities in the examples of typical functioning," and that "limitations of any of the activities in the examples do not necessarily mean that a child has a 'marked' or 'extreme' limitation . . . ." *Id*. A "marked" limitation is defined as a limitation caused by an impairment that interferes seriously with a child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). For children under the age of three, a "marked" limitation is demonstrated by "functioning at a level that is more than one-half but not more than two-thirds of [one's] chronological age," or "when [one has] a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [one's] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(ii)-(iii). For the domain of "health and physical well-being," a "marked" limitation is also defined as frequent illness because of one's impairments, or frequent exacerbations of one's impairments that result in significant, documented symptoms. "Frequent" is defined as an average of three times a year each for a period of two weeks or more, more often than three times a year but do not last two weeks, or less than three times a year but last longer than two weeks, "if the overall effect . . . is equivalent in its severity." 20 C.F.R. § 419.926a(e)(2)(iv).

An "extreme" limitation is defined as a limitation in a domain caused by an impairment that interferes "very seriously" with an individual's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). For children under the age of three, an "extreme" limitation is demonstrated by "functioning at a level that is one-half [one's] chronological age," or when a child has "a valid test score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or

functioning in that domain, and [one's] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(3)(ii)-(iii).  For the domain of "health and physical well-being," an "extreme" limitation is also defined as frequent illness because of one's impairment or frequent exacerbations of one's impairment that results in symptoms or signs "substantially in excess of the requirements for showing a 'marked' limitation . . . ." 20 C.F.R. § 416.926a(e)(3)(iv).   This Court finds the ALJ's determination is supported by substantial evidence in the record, and recommends that the decision of the Commissioner be AFFIRMED.

### A.      Substantial Evidence Supports the ALJ's Finding that Plaintiff Does Not Meet, Medically Equal, or Functionally Equal an Impairment Found in the Listings.

In this case, the ALJ properly determined that Plaintiff's impairments did not meet or medically equal an impairment from the listings; he determined that the medical evidence did not support the length and severity required to meet the listings for nephrotic syndrome with anasarca, and that there was not enough medical evidence to support the listing for developmental disorder or emotional disorders of infancy.  R. 14.  This court finds there is substantial evidence in the record to support the ALJ's decision that Plaintiff does not meet or medically equal a listing.

The ALJ also properly walked through the steps of functional equivalence, looking at each domain and assessing limitations.  R. 14-22.  He started by outlining each domain, and discussing why Plaintiff did not have marked limitations in two of the domains or an extreme limitation in one of the domains.  R. 14-22.

### 1.      Acquiring and Using Information

The ALJ started with the domain of acquiring and using information.  R. 16-17.  When assessing this domain, the Commissioner must "consider how well you acquire or learn

information, and how well you use the information you have learned." R. 16, 20 C.F.R. § 416.926a(g). A healthy, regularly developing child between ages one and three should be learning how objects go together in different ways; learning that one's actions when pretending can represent real things; referring to oneself and others by pointing and naming; forming concepts and solving simple problems through purposeful experimentation, imitation, constructive play, and pretend play; responding to increasingly complicated instructions and questions; and producing a growing number of words and eventually grammatically correct sentences. 20 C.F.R. § 416.926a(g)(2)(ii). The ALJ found that Plaintiff had no limitation in the acquiring and using information domain, and that no limitations were alleged. R. 17.

Based on the medical evidence in the record, there is substantial evidence to support the ALJ's decision. Plaintiff's IFSP notes[2] indicated that he enjoyed exploring toys, actively looked for toys, and could place a puzzle piece correctly into a large foam puzzle, including by adapting it to make it fit. R. 415. He could open small boxes to find blocks or other small toys inside, and could scribble on paper with crayons. R. 415. He also imitated housework by pushing a mop or broom around the floor. R. 413. He liked to explore his environment, and was curious about his toys and "how things work." R. 417. While Plaintiff was still deficient in some areas, such as producing a growing number of words, there is substantial evidence in the record to support the ALJ's decision to not find a marked or extreme limitation in this domain.

### 2.    Attending and Completing Tasks

When assessing the domain of attending and completing tasks, the Commissioner must "consider how well [one is] able to focus and maintain [one's] attention, and how well [one] begin[s], carr[ies] through, and finish[es] one's] activities, including the pace at which [one]

---

[2] The IFSP notes are duplicated in the administrative record, both from 411 to 426 and from 432 to 448. For ease and brevity's sake, in this section the undersigned will refer only to page numbers from the first instance of the IFSP records, from 411 to 426.

perform[s] activities and the ease at which [one] change[s] them." 20 C.F.R. § 416.926a(h).  A

healthy, developing child between ages one and three should be able to attend to things that

interest him or her; have adequate attention to complete tasks alone; be able to demonstrate

sustained attention, "such as when looking at picture books, listening to stories, or building with

blocks"; and to sustain attention when helping to dress oneself.  20 C.F.R. § 416.926a(h)(2)(ii).

The ALJ found that Plaintiff had no limitation in the attending and completing tasks domain, and

that no limitations were alleged.  R. 17-18.

Based on the medical evidence in the record, there is substantial evidence to support the

ALJ's decision.  Plaintiff attended long enough to play and enjoy playing pat-a-cake and listen to

nursery rhymes.  R. 413 & 415.  He also could concentrate to put together pieces in a simple

puzzle.  R. 415.  Although Plaintiff was deficient in some areas, such as helping his caregivers

dress him, there is substantial evidence in the record to support the ALJ's decision to not find a

marked or extreme limitation in this domain.  R. 18, 417.

### 3.      Interacting and Relating with Others

When assessing the domain of interacting and relating with others, the Commissioner

must consider how well a claimant can "initiate and sustain emotional connections with others,

develop and use the language of [his or her] community, cooperate with others, comply with

rules, respond to criticism, and respect and take care of the possessions of others."  20 C.F.R.

§ 416.926a(i).  A healthy, developing child between ages one and three should be able to begin

to separate his- or herself from his or her caregivers; express emotions and respond to the

feelings of others; begin to initiate and maintain interest with adults; show interest in, play

alongside, and eventually interact with children of his or her age; and spontaneously

communicate wishes and needs, first through gestures and then by speaking words clearly

enough that others can understand most of the time.  20 C.F.R. § 416.926a(i)(2)(ii).  The ALJ found that Plaintiff had no limitation in the interacting and relating with others domain, and that no limitations were alleged.  R. 18.

Based on the medical evidence in the record, there is substantial evidence to support the ALJ's decision.  Plaintiff played independently and walked from room to room by himself.  R. 413.  He liked playing with his sister and cousins, and would sit with them and join in play.  R. 413.  He enjoyed social games, and made an effort to please adults, such as repeating behavior that got them to laugh.  R. 413.  He expressed emotion by laughing or crying, including crying when toys were taken away.  R. 413.  He waved "bye-bye" when shown how by adults.  R. 415.  His grandmother indicated that he tried to do whatever his twin brother did.  R. 62.  Although Plaintiff did not have the range of sounds and verbal communication methods that should be expected of a child of his age, there is substantial evidence to support the ALJ's decision not to find a marked or extreme limitation.  R. 416.

### 4.    Moving About and Manipulating Objects

When assessing the domain of interacting and relating with others, the Commissioner must consider how well a claimant can move his or her body from one place to another, and how a claimant can move and manipulate things.  20 C.F.R. § 416.926a(j).  A healthy, developing child between ages one and three should be begin to actively explore a wide area of his or her physical environment; use his or her body with increasing control and independence from others; walk and run without assistance; climb with increasing skill; try to manipulate small objects; use his or her hands to do or get something he or she wants or needs; and play with small blocks, scribble with crayons, and feed his- or herself as his or her motor skills improve.  20 C.F.R. § 416.926a(j)(2)(ii).

The ALJ found that Plaintiff had less than a marked limitation in moving about and manipulating objects.  R. 19.  He stated that Plaintiff was receiving therapy to address strength, coordination, balance, floor mobility, transition and postural control issues, and that he is encouraged through a home therapy program to reach for light toys, both on his back and on his stomach.  R. 19.  The ALJ also referenced treatment notes from the individualized Family Service Plan dated March 1, 2012, where "it was noted that the claimant was feeling independent enough to walk to another room by himself."  R. 19.  The ALJ also found that:

> [t]he evidence supports that the claimant enjoys exploring toys in a variety of ways.  He looks at them, bangs them and mouths them.  Moreover, he actively looks for his toys and can problem-solve to put one piece in a three-piece fo[a]m board puzzle.  In addition, the claimant likes to scribble on paper with crayons and can open small boxes to find blocks or other small toys inside.  It was reported that the claimant dances and bobs along to music when he holds it up to his ear.  In addition, it was noted that he can walk everywhere, push toys and climb up and down stairs to explore his environment.  Moreover, he is very curious about toys and how [things] work and will move [other toys] around to get to the toy or object he is interested in.  It was noticed that he is not yet pushing his arms through clothing or lifting his legs to help with dressing; however, he will pull socks or a hat off of his head [sic].

R. 19-20.  These findings are supported by evidence in the record.  R. 344, 415-16.  There is substantial evidence in the record to support the ALJ's decision to find that, while there may be a limitation in this area, it is less than a marked limitation.

### 5.     Caring for Yourself

When assessing the domain of interacting and relating with others, the Commissioner must consider how well a claimant can "maintain a healthy emotional and physical state, including how well [he or she] gets [his or her] physical and emotional wants and needs met in appropriate ways; how [he or she] cope[s] with stress and changes in [his or her] environment; and whether [he or she] take[s] care of [his or her] own health, possessions, and living area."  20 C.F.R. § 416.926a(k).  A healthy, developing child between ages one and three should be trying

to do more things for his- or herself that increase his or her sense of independence and competence in the environment; possibly consoling his- or herself with a favorite blanket or object; learning to cooperate with caregivers, but also attempting to show what he or she can do on his or her own; and experimenting with his or her independence by showing some degree of contrariness and identity, often manifesting as yelling "no" or hoarding toys.   20 C.F.R. § 416.926a(k)(2)(ii).

The ALJ found that Plaintiff had less than a marked limitation in the ability to care for himself.  R. 20-21.  The ALJ noted that Plaintiff's mother was concerned that Plaintiff was not using words or imitating sounds, and was not responding to his name or sounds consistently.  R. 20.  He also noted that Plaintiff had slight separation anxiety that had begun to resolve and threw mild tantrums when frustrated, though within the limits for a normal child of his age.  R. 20-21.  The ALJ also opined that Plaintiff showed some understanding of the word "no," though the understanding was not consistent, and that Plaintiff expressed emotion through laughing or crying.  R. 20.  The ALJ also opined that Plaintiff was lacking some skills expected in a 17-month-old, like calling for family members by name, imitating adult activities like talking on the phone, and using words like "no" and "stop" to assert himself; in fact, he was not yet using his voice or pointing to express his needs.  R. 21.  However, the ALJ noted that Plaintiff did respond to the word "no" when it is said loudly and firmly, and responded to simple commands when they were accompanied by a gesture.  R. 21.  The ALJ also noted that an audiological assessment had been recommended for Plaintiff, but had not been performed.   These findings are all supported by evidence in the record.  R. 415-16.  This Court finds that, despite the evidence of a potential limitation, there is substantial evidence to support the ALJ's decision that the limitation does not reach the level of "marked" or "extreme."

### 6.      Health and Physical Well-Being

The last domain the ALJ examined was that of health and physical well-being.  This domain is a significantly different assessment, considering mainly "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [one's] functioning that we did not consider in paragraph (j) of this section [the "moving about and manipulating objects" domain]."  20 C.F.R. § 416.926a(l).  There is no specific category for age; the assessment simply weighs other physical or mental impairments and their effects on a claimant's ability to function.  The ALJ found that Plaintiff had less than a marked limitation in this domain.  R. 21.  To support this, the ALJ recounted Plaintiff's medical history, detailed above, with particular emphasis on Plaintiff's segmental colon resection and subsequent recovery; his trouble with hard stools and other constipation problems; his hydronephrosis, worse on the right than the left; and noted that throughout these procedures, Plaintiff maintained an appetite, clear lungs, a regular heartbeat, and a normal sleeping pattern.  R. 21-22.

The ALJ further discussed how he weighed state agency determinations; namely, he considered them non-examining expert sources and gave them moderate weight, because Plaintiff's progress notes indicated more of a limitation than previously determined.  R. 22.  He concluded that while "medical evidence supports that the claimant has moderate limitations in several domains, the evidence fails to support disabling limitations that meet the childhood disability guidelines."  R. 22.  There is substantial evidence in the record to support these conclusions, and therefore the decision of the ALJ must be upheld.  There is substantial evidence that Plaintiff did not demonstrate marked limitations in two domains or an extreme limitation in one domain, so Plaintiff did not functionally equal an impairment in the listings.

**B.**     **The Documents Attached to Plaintiff's Response Cannot be Considered by This Court, and Plaintiff's Case Should Not Be Remanded for Their Consideration**

When reviewing the decisions of an ALJ, district courts "are restricted to the administrative record in performing their limited function of determining whether the [Commissioner's] decision is supported by substantial evidence." *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972); *see also Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) ("[I]n determining whether the ALJ's decision is supported by substantial evidence, a district court cannot consider evidence which was not presented to the ALJ."); *Ahearn v. Mathews*, 438 F.2d 931, 932 (E.D. Va. 1977) ("The function of this Court is to determine whether the agency decision is supported by substantial evidence based upon the record as a whole.").  Because of this, this Court cannot look at any evidence not submitted to the Commissioner and entered into the administrative record.  The documents submitted in Plaintiff's Response, ECF No. 11-1, cannot be considered by this Court.

This Court also will not remand the case back to the Commissioner for an examination of the new evidence.  Sentence six of 42 U.S.C. § 405(g) allows that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ."  42 U.S.C. § 405(g) (2012).  Based on this, any evidence to warrant a remand must be new, material, and have good cause for why it was not presented to the Social Security Agency prior to then.  *See Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993).  This remand is without comment on the merits of the case; "[t]he district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative proceeding."  *Melkonyan v. Sullivan*,

501 U.S. 89, 98 (1991) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).  For remand under sentence six of 20 U.S.C. § 405(g), "evidence is considered new if it is not duplicative or cumulative and is material if there is a reasonable possibility that the new evidence would have changed the outcome."  *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011)(quoting *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93, 96 (4th Cir. 1991))(quotation marks omitted).

The documents attached to Plaintiff's Response are new, because all but one of the documents is dated after the decision of the ALJ, and none are found in the administrative record.  See Documents Accompanying Response (hereinafter "Doc's"), ECF No. 11-1.  Furthermore, they all present information that sheds light on Plaintiff's progressing conditions as he gets older, and therefore are not duplicative or cumulative.  All but one document, the patient encounter form, has immediate and obvious good cause for why it was not incorporated into the record before, because those documents all were created after the date of the ALJ's decision.  There is no immediate reason visible from the patient encounter form why it was not submitted to the ALJ, as it was created a month before Plaintiff's hearing date, on January 12, 2012, and Plaintiff's Response does not explain why the document was not produced at that time.  ECF No. 11, Doc's 7-8, ECF No. 11-1.  Because the administrative record contains evidence from after that period of time, from January 17, 2012 to April 27, 2012, the undersigned finds that Plaintiff failed to show good cause for why the document was not presented to the Commissioner, and remand cannot be granted on the basis of that document.

The remaining documents are a neurodevelopmental evaluation performed by Dr. Aiello at Children's Specialty Group, Doc's 1-2; and a progress report, Doc's 3, an eligibility summary statement, Doc's 4, a Notice of Eligibility Committee Action, Doc's 5, and a Notice of

25

Individualized Education Program (IEP) Team Meeting, Doc's 6, all from Norfolk Public Schools.  All are new and have good cause for not being previously included, but none meet the standard for materiality.

The neurodevelopmental evaluation describes Plaintiff's ongoing developmental impairments in "expressive language skills," which may indicate a cognitive impairment, and Plaintiff's "congenital anomalies including congenital hydronephrosis."  Doc's 2.  While the examination does provide insight into Plaintiff's condition as he ages, it does not provide any information that could be considered material, because none of the additional information raises a reasonable possibility that it would change the outcome.  The ALJ found that Plaintiff had severe impairments of developmental delay and nephritic syndrome.  R. 14.  The information in the evaluation serves to bolster the ALJ's finding that these impairments are severe.  However, the evaluation does not provide information that would reasonably change the ALJ's analysis that Plaintiff does not meet, medically equal, or functionally equal an impairment in the listings.  The evaluation indicated that Plaintiff scribbled on paper with a pen, was cooperative during the examination, and said one word during the appointment.  Doc's 2.  Neither this nor any of the information in the evaluation shows a direct contradiction to, nor a strong difference from, the conclusions of the ALJ.  Because of that, the evaluation is not material, and this Court will not remand the case for its consideration.

The other four documents also do not meet the standard for materiality.  Taken as a whole, the Norfolk Public Schools documents do not provide any additional information that would reasonably change the outcome of the ALJ's decision.[3]  The documents detail that Plaintiff uses single words and approximations to communicate; is imitating isolated sounds; is

---

[3] The Notice of Individualized Education Program (IEP) Team Meeting form is arguably not relevant and certainly not material, because it provides no information other than the fact that the school feels an IEP is necessary and that there is an upcoming team meeting to discuss it.  Doc's 6.

spontaneously commenting, though unintelligibly in new contexts; cries, vocalizes and babbles to indicate his needs; responds to his name and to some short commands; and has forty-four to fifty-five percent kidney function.  Doc's 3-4.  All of this contributes to the ALJ's decision to find that Plaintiff has severe impairments of developmental delay and nephritic syndrome, but does not contradict or show a reasonable probability that it would alter the outcome of the ALJ's decision to find that Plaintiff does not meet, medically equal, or functionally equal the listings. R. 14.

Two of the Norfolk Public School documents have checkboxes to indicate that Plaintiff "has a disability," Doc's 4, and "is eligible for special education services" due to meeting the eligibility criteria for "developmentally delayed," Doc's 5.  The undersigned agrees with the analysis provided by Defendant that these assessments of disability are not material within the meaning of sentence six of 20 U.S.C. § 405(g).  Def.'s Mem. 23-24, ECF No. 13.  Defendant correctly states that the Fourth Circuit requires substantial weight be given to determinations of disability by the Veteran's Administration ("VA").  *Id.*, *see also Bird v. Comm'r of Social Security*, 669 F.3d 337, 343-45 (4th Cir. 2012).  From that, it is possible that Plaintiff could extrapolate that a disability determination from a government body like the Norfolk Public Schools must be given substantial weight.  However, the substantial weight given to VA disability determinations is based on the fact that the VA performs an in-depth analysis into an individual's ability to perform work in the national economy, including a focus on examining functional limitations.  *Bird*, 669 F.3d at 343-45.  Defendant correctly assesses Norfolk Public Schools' disability determination as likely adhering to the standards put forth by the Individuals with Disabilities Education Act ("IDEA"), which does not evaluate based on an individual's ability to perform work in the national economy, but rather considers a child to have a disability

27

if they suffer from some sort of medical impairment and, because of that, need special education and related services.  Def.'s Mem. 23-24, *see also* 20 U.S.C. § 1401(3)(A).  Because IDEA does not assess based on the same criteria that the Social Security Administration does, the undersigned agrees with the Defendant that the IDEA disability determination should not be given substantial weight.  It is, instead, merely a factor to be considered and, like the other aspects of the Norfolk Public School documents, does not supply any information from which there would be a reasonable probability that the ALJ's decision would have been different.

Because none of the documents meet all three of the criteria necessary for a sentence six remand, the undersigned declines to remand the case to the Commissioner to consider any of the additional evidence.

The undersigned notes that Plaintiff and his mother have the option to refile a claim for SSI, which may prove more successful; new medical reports or developments, along with the documents this court could not address in this opinion, may be able to form the basis for a new claim.  Plaintiff's mother is encouraged to consider her options carefully.

## V.  RECOMMENDATION

Based on the foregoing analysis, this Court recommends that Plaintiff's Response, construed by this Court to be a Motion for Summary Judgment, (ECF No. 10) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).


                                          /s/
                              Tommy E. Miller
                    UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 18, 2014

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to the

following:

Chaquita Rumble
3018 Dunkirk Ave.
Norfolk, VA 23509

Mark Anthony Exley, Esq.
United States Attorney Office
101 W Main St., Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk

By _____/s/ T. Brown_____
     Deputy Clerk

June 18, 2014
